**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-21-08117-001-PCT-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Marlon Dazen, Jr., | |
| Defendant. | |

Pending before the Court is Defendant's suppression motion. (Doc. 34.) Defendant seeks to suppress the statements he made on February 23, 2021 in response to questioning by FBI Special Agent Timothy Wilkins ("SA Wilkins") and since-retired Arizona Department of Public Safety Detective Chris Schahn ("TFO Schahn").

After the government filed an opposition brief (Doc. 39), the Court held an evidentiary hearing. During the hearing, SA Wilkins and TFO Schahn (together, "the agents") both testified. (Doc. 42.) At the conclusion of the hearing, the Court solicited supplemental briefing from the parties. (Docs. 50, 51.) Having now reviewed that briefing, the Court concludes the suppression motion should be denied.

**FACTUAL FINDINGS**

The Court found SA Wilkins and TFO Schahn to be credible witnesses and accepts their account of the events in question. The Court also notes that, because nearly all of the agents' interview of Defendant was audio recorded (and has since been transcribed, *see* Doc. 39-1), many aspects of the encounter are undisputed. With those clarifications in

mind, the relevant facts are as follows.

On February 23, 2021, the agents traveled to a rural area within the Fort Apache Indian Reservation as part of an investigation in allegations that Defendant had recently assaulted his ex-girlfriend. The purpose of the trip was to locate the victim's aunt, who was a potential witness. When the agents walked up to the tent where the aunt lived, they were told she wasn't there. As the agents were walking on a dirt path back to their car, Defendant happened to walk nearby on a different dirt path. Defendant was wearing a red bandana and red shoes, and TFO Schahn perceived his attire to be gang-related.

After an unidentified person yelled out, "Hey, there's Fussy" (which SA Wilkins recognized as Defendant's nickname), SA Wilkins walked up to Defendant, introduced himself, displayed his credentials, and asked if Defendant would be willing to speak to the agents "about something that happened recently." At the time, the agents were dressed in plain clothes and their holstered firearms were concealed by their clothing.

During this portion of the encounter (which wasn't recorded),[1] SA Wilkins specifically informed Defendant that he didn't have to speak with the agents if he didn't want to do so. In response, Defendant voluntarily agreed to speak with the agents.

At this point in the encounter, TFO Schahn asked Defendant if he had any weapons. Defendant responded that he had knives. TFO Schahn then frisked Defendant and temporarily took possession of two knives (as well as Defendant's flashlight). The only reason TFO Schahn took these items was because the agents "thought it would be a safer environment in which to speak." At no point did the agents use their possession of the items as leverage to get Defendant to speak or remain present.

Around this time, SA Wilkins's audio device began recording. (Doc. 39-1.) As the transcript reveals, SA Wilkins allowed Defendant to choose where the conversation would take place. Defendant stated: "Let's go sit in the shade." (*Id.* at 4.) Defendant then led the agents to a location near a tree/bush, which was more than 200 yards away from the

---

[1] SA Wilkins credibly testified that the only reason this portion of the encounter wasn't recorded was because the encounter was unexpected and it took a bit of time to get the recording device running.

- 2 -

nearest structure and about a quarter-mile away from the nearest paved road.

Upon arrival, Defendant took a seated position while SA Wilkins took a kneeling/crouching position. The surrounding environs were wide open and Defendant was not physically boxed in by the agents or otherwise physically prevented from leaving. Additionally, third parties would occasionally walk nearby on the dirt paths in the vicinity.

At the outset of the interview, SA Wilkins said "just in case you're wondering, like, you're not under arrest. . . . After we're done talking today, you go about your business. Okay?" (*Id.* at 4-5.) In response, Defendant said: "All right." (*Id.* at 5.) SA Wilkins then added: "I'm not—I'm not arresting you, nothing like that. Okay? I'm just here to talk and get your side of it. All right?" (*Id.*)

The resulting interview took about 55 minutes. In broad strokes, the interview involved the agents asking Defendant about the allegations against him. The agents also took photographs of Defendant. Although the agents occasionally challenged Defendants' statements and although Defendant occasionally became agitated, the agents' tone was polite and respectful throughout. The agents never displayed their firearms and at no point did Defendant suggest that he didn't want to talk or try to walk away.

During the latter part of the interview, after Defendant made certain admissions, Defendant spontaneously stated: "Do whatever you guys got to do to me. . . . I don't give a fuck." (*Id.* at 71.) TFO Schahn responded: "We're not here to do anything, bro." (*Id.* at 72.) SA Wilkins added: "Look, for real. I—I'm here to get the—your side of it, the hundred—the truth . . . from you. That's it. Okay? So that's all I want. That's all I'm trying to get. I'm not trying to do anything to you at all." (*Id.*) Defendant then stated: "You guys want to arrest me, go ahead." (*Id.*) SA Wilkins responded: "No, not under arrest at all. Okay? You're—when you're done, you're done. You don't have to talk to us if you don't want. And we're going to go on [our] way and you'll go on yours." (*Id.*)

The interview continued for several minutes after this exchange. At the conclusion of the interview, SA Wilkins gave his business card to Defendant, invited Defendant to contact him if anything came up, and told Defendant that the agents were going to walk

back to their truck. In response, Defendant volunteered to walk the agents back to their truck. The resulting walk took about seven minutes. Upon arrival at the truck, TFO Schahn returned the knives and flashlight to Defendant.

**ANALYSIS**

I. <u>Consensual Encounter Or Custodial Interrogation</u>

Defendant's primary argument is that he was effectively in custody during the encounter on February 23, 2021, so the agents' failure to provide *Miranda* warnings means his statements must be suppressed. (Doc. 34 at 3 ["Based on the totality of the circumstances, a reasonable person in Mr. Dazen's position would have considered his situation to be one of police custody. Mr. Dazen was approached by two law enforcement agents, was frisked and had his personal belongings confiscated, none of which was contraband. He also had identifying pictures taken—one specifically of his tattoo. He was questioned for nearly an hour on matters far beyond the recognized bounds of a non-custodial *Terry* inquiry. It became a custodial interrogation and should have been provided *Miranda* warnings."]). The government responds that no *Miranda* warnings were required because "all evidence supports that this was a consensual encounter with the police." (Doc. 39 at 5-7.)

"An officer's obligation to give a suspect *Miranda* warnings before interrogation extends only to those instances where the individual is 'in custody.'" *United States v. Kim*, 292 F.3d 969, 973-74 (9th Cir. 2002) (citation omitted). *Miranda* warnings are not, therefore, required during a consensual encounter between a suspect and law enforcement. *See, e.g., United States v. Lillich*, 6 F.4th 869, 877 (8th Cir. 2021) ("A consensual encounter does not amount to a custodial situation requiring the administration of *Miranda* warnings.") (citation omitted). *Cf. United States v. Redlightning*, 624 F.3d 1090, 1103 (9th Cir. 2010) ("When an encounter is consensual, it is 'outside the ambit of the Fourth Amendment's guarantee against unreasonable searches and seizures.'") (citation omitted).[2]

---

[2] Nor are *Miranda* warnings generally required during a *Terry* stop. *United States v. Davis*, 530 F.3d 1069, 1081 (9th Cir. 2008) ("Where an individual has been detained incident to a search warrant, and officers' questioning stays within the bounds of questioning permitted during a *Terry* stop, *Miranda* rights are not required. If, however,

The necessity of *Miranda* warnings in this case thus turns on how to characterize the encounter on February 23, 2021—was it (or did it become) a custodial interrogation, or did it remain a consensual encounter from start to finish?

"[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions. . . . The encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature." *Florida v. Bostick*, 501 U.S. 429, 434 (1991). Here, Defendant's theory is not just that he was seized but that he was in custody. "To determine whether an individual was in custody, a court must, after examining all of the circumstances surrounding the interrogation, decide whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Kim*, 292 F.3d at 973 (cleaned up). "The inquiry focuses on the objective circumstances of the interrogation, not the subjective views of the officers or the individual being questioned. That is, we must determine whether the officers established a setting from which a reasonable person would believe that he or she was not free to leave." *Id.* at 973-74 (cleaned up). "The following factors are among those likely to be relevant to deciding that question: '(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual.'" *Id.* at 974 (citation omitted). "Other factors may also be pertinent to, and even dispositive of, the ultimate determination whether a reasonable person would have believed he could freely walk away from the interrogators; the [cited] factors are simply ones that recur frequently." *Id.* See also *United States v. Washington*, 387 F.3d 1060, 1068 (9th Cir. 2004) (noting that some additional factors that "aid in determining whether a reasonable person would have felt 'at liberty to ignore the police presence and

---

the individual is asked questions going 'beyond a brief *Terry*-type inquiry,' the individual is entitled to *Miranda* warnings.") (citation omitted); *United States v. Woods*, 720 F.2d 1022, 1029 (9th Cir. 1983) ("Appellants apparently believe that questioning during a lawful temporary detention or seizure of the person is custodial interrogation. No authority is cited in support of this proposition. The law of this circuit is to the contrary."). *See also* Doc. 51 at 2 [Defendant's supplemental brief: "*Terry* stops do not require prior *Miranda* warnings . . . ."].)

- 5 -

go about his business'" include "(1) the number of officers; (2) whether weapons were displayed; (3) whether the encounter occurred in a public or non-public setting; (4) whether the officer's officious or authoritative manner would imply that compliance would be compelled; and (5) whether the officers advised the detainee of his right to terminate the encounter") (citations omitted).

Considering the relevant factors, and in light of the totality of the circumstances, the Court concludes that the interaction between Defendant and the agents on February 23, 2021 remained a consensual encounter from start to finish. The encounter began with two agents, who were dressed in a non-threatening fashion, fortuitously seeing Defendant as he was walking through his community and asking if he would agree to talk with them. SA Wilkins specifically advised Defendant that he didn't have to speak if he didn't want to do so. After Defendant agreed to speak, he was allowed to pick where the conversation would take place, and he chose a wide-open public space that was visible to passersby. During the resulting conversation, which took less than an hour, the agents repeatedly told Defendant that he was not under arrest. It is clear that Defendant subjectively understood this point because he eventually asked the agents if they were *going* to arrest him in light of the admissions he'd just made—a request that would be nonsensical if he believed he was already under arrest. The agents retained a polite and courteous tone throughout the encounter, never once displaying or brandishing their firearms, and Defendant felt so unthreatened by them that he agreed to walk them back to their car once the interview was complete.

Of course, a handful of the non-dispositive factors that bear on the determination of custodial status could be viewed (at least in isolation) as supporting Defendant's position. During the interview, the agents questioned Defendant about the substance of the victim's allegations against him, which could be construed as confronting Defendant with evidence of his guilt. Additionally, the fact that TFO Schahn held on to Defendant's knives and flashlight during the interview—which is addressed in more detail in Part II below—could

have created some mild pressure on Defendant to remain.³ Nevertheless, after weighing all of the evidence and relevant factors, the Court concludes that a reasonable person would have felt free to leave throughout the entirety of Defendant's conversation with the agents. This was a consensual encounter.

II.  The Frisk And Temporary Seizure Of The Knives And Flashlight

Defendant also contends in his suppression motion that "the agents' frisk of Mr. Dazen is violative of Mr. Dazen's Fourth Amendment rights. . . . There were no indications of the presence of a weapon, sudden movements to reach for something concealed, or unnatural hand gestures or movements. Given that there was no valid basis for search, Mr. Dazen's statements as a result of this illegal search should also be suppressed." (Doc. 34 at 4.)

At the conclusion of the evidentiary hearing, the Court asked the parties to provide supplemental briefing concerning the legality of the frisk and its effect, if any, on the admissibility of Defendant's post-frisk statements. (Doc. 42.) In his supplemental brief, Defendant contends that (1) the agents lacked reasonable suspicion to detain him under *Terry* or frisk him; (2) the encounter began as an illegal *Terry* stop and never reverted into a consensual encounter; and (3) alternatively, even if the encounter reverted into a consensual encounter, suppression remains necessary because there was "insufficient attenuation between the unlawful frisk and Mr. Dazen's statement." (Doc. 51.) Meanwhile, in its supplemental brief, the government argues, *inter alia*, that it doesn't matter whether the agents had reasonable suspicion to *detain* Defendant under *Terry* (because this was a consensual encounter), that the agents were entitled to *frisk* Defendant during the consensual encounter so long as they had reasonable suspicion that he was

---

³ Defendant places heavy emphasis on the fact that SA Wilkins's advisement at the beginning of the interview—"After we're done talking today, you go about your business"—did not expressly inform him that he could end the interview at any time. The Court is unpersuaded. Putting aside that Defendant's ability to end the interview at any time was fairly implied by the agents' other statements and overall conduct, "the consensual nature of [an] encounter is not undermined by [an officer's] failure to expressly tell [the suspect] that he was free to leave." *United States v. Orman*, 486 F.3d 1170, 1175-76 (9th Cir. 2007). *See also INS v. Delgado*, 466 U.S. 210, 216 (1984) ("While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response.").

1 armed, and that Defendant supplied the necessary reasonable suspicion by stating at the outset of the encounter that he was armed with knives. (Doc. 50.)

The government has the better of these arguments. The relevant authority here is *United States v. Orman*, 486 F.3d 1170 (9th Cir. 2007). There, during the early stages of a consensual encounter in a shopping mall, a law enforcement officer (Ferragamo) asked a suspect (Orman) whether he was armed. *Id.* at 1172. After Orman admitted he had a gun, Ferragamo patted him down and retrieved a gun from his waist band. *Id.* at 1172 & n.2. Orman later moved to suppress, arguing "that Officer Ferragamo [needed to] have reasonable suspicion that a crime was being committed before he could lawfully retrieve Orman's gun for officer safety purposes, even if the encounter was consensual." *Id.* at 1173. The Ninth Circuit disagreed, emphasizing that "*Terry* did not cabin the use of officer safety patdowns to lawful investigatory detentions" and that a *Terry* frisk—which is distinct from a *Terry* stop—need only be based "on a reasonable suspicion that the person is armed." *Id.* at 1173-74 (citing *United States v. Flippin*, 924 F.2d 163 (9th Cir. 1991)). The court went on to hold that Ferragamo's frisk of Orman was permissible because "Ferragamo's reasonable suspicion that Orman was carrying a gun, which is all that is required for a protective search under *Terry*, quickly rose to a certainty when Orman confirmed that he was carrying a gun. Indeed, the retrieval of the gun was less intrusive than the patdown in *Terry*—Orman pointed to his waistband at which time Ferragamo raised Orman's shirt and retrieved the gun." *Id.* at 1176.

Here, too, TFO Schahn asked Defendant at the outset of a consensual encounter whether Defendant was armed, Defendant responded by confirming that he was armed with knives, and TFO Schahn then conducted a frisk to retrieve the knives for officer-safety purposes. Defendant's answer to TFO Schahn's question provided all of the reasonable suspicion that was necessary to justify the resulting frisk. And because the frisk was lawful, nothing about it taints the admissibility of the statements that Defendant made during the later portions of the consensual encounter.

…

Case 3:21-cr-08117-DWL Document 52 Filed 03/03/23 Page 9 of 9

Accordingly,

**IT IS ORDERED** that Defendant's suppression motion (Doc. 34) is **denied**.

Dated this 3rd day of March, 2023.

_____
Dominic W. Lanza
United States District Judge